F I L E D
United States Court of Appeals
Tenth Circuit

DEC 13 2000

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SOUTHWESTERN BELL TELEPHONE
COMPANY,

     Plaintiff-Appellant,

v.

BROOKS FIBER COMMUNICATIONS
OF OKLAHOMA, INC.; BROOKS
FIBER COMMUNICATIONS OF
TULSA, INC.; ED APPLE, Chairman;
BOB ANTHONY; DENISE BODE (in
their official capacities as commissioners
of the Oklahoma Corporation
Commission); OKLAHOMA
CORPORATION COMMISSION,

     Defendants-Appellees.

No. 99-5222

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 98-CV-468-K)

---

Aaron M. Panner of Kellogg Huber, Hansen, Todd & Evans, P.L.L.C. (Richard C.
Ford of Crowe & Dunleavy, and Charles J. Scharnberg, Southwestern Bell Telephone
Company, Oklahoma City, Oklahoma, with him on the brief), Washington, D.C., for
Plaintiff-Appellant.

Darryl M. Bradford of Jenner & Block (John J. Hamill and John R. Harrington of
Jenner & Block, Chicago, Illinois, and Adam H. Charnes and Mark B. Ehrlich, MCI
WORLDCOM, Inc., Washington, D.C., with him on the brief), Chicago, Illinois, for
Defendant-Appellee Brooks Fiber.

Rachel Lawrence Mor, Deputy General Counsel, Oklahoma Corporation Commission (Andrea Johnson, Senior Attorney, with her on the brief), Oklahoma City, Oklahoma, for Defendant-Appellee Oklahoma Corporation Commission.

---

Before **BALDOCK**, **POLITZ**,[*] and **LUCERO**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, codified at 47 U.S.C. § 151 et seq. (the Act), aims to encourage competition in the telephone services industry.  Among other things, the Act requires telephone companies competing within the same area to "interconnect" their networks to ensure that callers who subscribe to one local telephone service can receive calls from, and place calls to, those who subscribe to a different local telephone service.  See 47 U.S.C. § 251(c)(2)(A).  The Federal Communications Commission (FCC) is authorized to establish regulations implementing the requirements of § 251.  Id. § 251(d)(1).

The terms under which the networks are connected are contained in "interconnection agreements."  The Act directs telephone companies to attempt to agree upon the terms of interconnection through negotiation.  Id. § 252(a)(1).  If they cannot agree, the Act directs the governing state commission to arbitrate or mediate disputed

---

[*] The Honorable Henry A. Politz, United States Court of Appeals for the Fifth Circuit, sitting by designation.

2

issues.  Id. § 252(b)(1).  The duties which the Act imposes are only minimum requirements, and telephone companies may enter into interconnection agreements "without regard" to the Act's requirements.  Id. § 252(a)(1).  The state commission must, however, approve the final agreement.  Id. § 252(e)(1).  In this case, Plaintiff Southwestern Bell Telephone Company and Defendant Brooks Fiber Communications agreed upon all the terms of interconnection.  The Oklahoma Corporation Commission (OCC) subsequently approved their Interconnection Agreement (Agreement or Interconnection Agreement).

Meanwhile, § 251(b)(5) of the Act imposes a duty on local exchange carriers (LEC) to "establish reciprocal compensation arrangements for the transport and termination of telecommunication."  Reciprocal compensation is designed to compensate an LEC for completing a local call from another LEC.  The Act requires that the originating caller's LEC, in this case Southwestern Bell, compensate the LEC who completed the call, in this case Brooks Fiber.  Id. § 251(b)(5).  In its 1996 Local Competition Order, the FCC ruled that the Act's "§ 251(b)(5) obligations should apply only to traffic that originates and terminates within a local area."  11 F.C.C.R. 16013, ¶ 1034 (1996).  Accordingly, the Agreement between Brooks Fiber and Southwestern Bell requires reciprocal compensation only when they exchange "local traffic."  The Agreement defines local traffic as follows:

> Calls originated by one Party's end users and terminated to
> the other Party's end users shall be classified as local traffic

3

under this Agreement if the call originates and terminates in the same [Southwestern Bell] exchange area . . . or originates and terminates within different [Southwestern Bell] exchanges which share a common mandatory local calling scope. Calls not classified as local under this Agreement shall be treated as interexchange for intercompany compensation purposes.

Application of the reciprocal compensation provisions of the Agreement between Southwestern Bell and Brooks Fiber is the subject of this lawsuit. In June 1997, after performing under the Agreement for nearly nine months, Southwestern Bell declared it would no longer pay reciprocal compensation for calls to Internet Service Providers ("ISPs") doing business with Brooks Fiber because, according to Southwestern Bell, calls to ISPs are interstate communications which the Agreement's reciprocal compensation provisions do not cover. Brooks Fiber then filed an application with the OCC requesting a determination that calls delivered from Southwestern Bell customers to an ISP located within the same local exchange are "local traffic" and subject to the Act's reciprocal compensation requirements.

A state administrative law judge ruled in favor of Southwestern Bell, determining that calls to ISPs are not subject to reciprocal compensation. Brooks Fiber appealed the ALJ's decision. The OCC reversed the ALJ's decision, reasoning that such traffic is local, terminates at the ISP, and is subject to reciprocal compensation. Southwestern Bell

4

sought review of the OCC's order in federal district court.[1]  Southwestern Bell argued that the OCC's order rested on the erroneous conclusion that federal law characterizes calls to ISPs as local traffic.  According to Southwestern Bell, this conclusion conflicted with (1) the plain language of the Agreement, (2) state and federal precedent regarding what constitutes local traffic, and (3) the reciprocal compensation provisions of the Act.

The district court concluded that its jurisdiction to review the OCC's order was limited to determining compliance with federal law, and did not extend to review of Oklahoma state contract law issues.  Accordingly, the court upheld the OCC's order as consistent with federal law, but declined to review the OCC's application of state contract law to the Agreement.  Southwestern Bell appeals the district court's decision.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291.  While we disagree with the district court's conclusion that it had no jurisdiction to review the OCC's application of state contract law, we ultimately affirm the court's judgment in favor of Brooks Fiber as modified because the OCC's interpretation of the Interconnection Agreement is consistent with both federal and state law.

I.

The substantive questions that Southwestern Bell and Brooks Fiber ask us to

---

[1]  Southwestern Bell also appealed the OCC's order to the Supreme Court of Oklahoma.  The supreme court dismissed the appeal, holding that the federal district court has exclusive jurisdiction to review the OCC's actions.  We express no opinion on the supreme court's determination.

decide are: (1) whether the OCC properly interpreted the Interconnection Agreement as requiring reciprocal compensation for calls to ISPs, and (2) whether the Interconnection Agreement, as interpreted by the OCC, complies with federal law. At the outset, however, we must address several issues regarding the district court's subject matter jurisdiction over this litigation. See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) ("every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review"). Specifically, this appeal raises important issues regarding the proper role of state commissions and federal courts in making and reviewing determinations under the Act. As noted, the district court limited its review to whether the OCC's decision complied with federal law. Southwestern Bell argues we have plenary authority to review all aspects of the OCC's decision. Therefore, we are compelled to analyze (1) the OCC's jurisdiction to interpret the Agreement under federal law, (2) the district court's jurisdiction to review the state commission's interpretation, and (3) the proper scope of federal review.

### A.

We begin by recognizing that the OCC acted within its jurisdiction in interpreting the previously approved Interconnection Agreement between Southwestern Bell and Brooks Fiber. The Act authorizes state commissions to mediate and arbitrate disputes over interconnection agreements during the parties negotiations. 47 U.S.C. §§ 252(a)(2)

6

& (b)(1). The Act also specifies that the appropriate state commission must approve each interconnection agreement. Id. § 252(e)(1). Courts have held that this grant to the state commissions to approve or reject and mediate or arbitrate interconnection agreements necessarily implies the authority to interpret and enforce specific provisions contained in those agreements. Southwestern Bell Tel. Co. v. Public Util. Comm'n, 208 F.3d 475, 479 (5th Cir. 2000); see also Iowa Util. Bd. v. FCC, 120 F.3d 753, 804 n.24 (8th Cir. 1997) ("the enforcement decisions of state commissions would also be subject to federal district court review under subsection 252(e)(6)"), aff'd in part, rev'd in part on other grounds sub nom. AT&T Corp. v. Iowa Util. Bd., 119 S. Ct. 721 (1999).

Moreover, the FCC has concluded that "inherent in state commissions' express authority to mediate, arbitrate, and approve interconnection agreements under § 252 is the authority to interpret and enforce previously approved agreements." In The Matter of Starpower Communications, 15 F.C.C.R. 11277, ¶ 7 (2000). We must defer to the FCC's view because it is a reasonable interpretation of § 252. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984). Accordingly, the OCC properly exercised its jurisdiction in interpreting the Agreement to resolve a dispute between the parties.

B.

We next conclude that the district court had jurisdiction to review the decision of the OCC interpreting the Interconnection Agreement. Section 252(e)(6) of the Act

7

states, "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of §§ 251 and 252." In addition, Congress expressly eliminated state court jurisdiction to review actions of state commissions in approving or rejecting interconnection agreements. 47 U.S.C. § 252(e)(4) ("No state court shall have jurisdiction to review the action of a state commission in approving or rejecting an agreement under this section"). Therefore, federal district court's jurisdiction to review a state commissions approval or rejection of an interconnection agreement is explicit.

A more difficult question is whether the district court's jurisdiction extends to other actions of the state commission, specifically decisions interpreting or enforcing interconnection agreements subsequent to their initial approval. We agree with the Fifth Circuit that § 252(e)(6) should not be construed so narrowly as to limit federal jurisdiction to only those decisions that either approve or reject interconnection agreements. Southwestern Bell, 208 F.3d at 480. Section 252(e)(6) grants federal courts jurisdiction in "any case" in which a state commission makes a "determination" under this section. When a state commission, after approving an agreement pursuant to the authority granted by the Act, subsequently issues another decision interpreting the terms of the agreement, this is also a "determination" pursuant to its authority under § 252. A rule that restricted a district court's jurisdiction to review of a state commission's approval or

8

rejection of an interconnection agreement would lead to results that Congress could not have intended.  Under such a rule, certain state commission decisions would escape federal review simply because the dispute arose after the agreement had been approved.  The district court consequently had jurisdiction to review the OCC's decision interpreting and enforcing the federally mandated Interconnection Agreement between Southwestern Bell and Brooks Fiber.

## C.

The proper scope of the district court's review of the OCC's actions is our next inquiry.  We must consider whether the district court is limited to reviewing the OCC's actions only for compliance with federal law, or whether the court's review may extend to application of state contract law.  The district court, relying on decisions from the First and Seventh Circuits, limited its review to determining compliance with federal law.  See Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd., 189 F.3d 1, 10 (1st Cir. 1999) (federal court can only review state commission's application of state law to the extent it conflicts with §§ 251 and 252); Illinois Bell Tel. Co. v. WorldCom Tech., Inc., 179 F.3d 566, 570-571 (7th Cir. 1999) (same).  Under this framework, state courts would presumably have to decide issues of state law in a separate proceeding.[2]  Southwestern

---

[2] The Seventh Circuit noted that a rule where jurisdiction was limited to determining compliance with federal law creates an absurd jurisdictional scheme in which:

(continued...)

Bell, 208 F.3d at 481.

Subsequent to the district court's determination in this case, three other circuits have considered this same issue and taken a more expansive view of federal jurisdiction. The Fourth, Fifth and Ninth Circuits direct district courts to consider de novo whether the agreements are in compliance with the Act and the implementing regulations. Southwestern Bell, 208 F.3d at 482; GTE South, Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. 1999); US West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999). In those circuits, the district court reviews all other issues, including state law determinations, under an arbitrary and capricious standard. Id. We find this approach to be preferable. Although the circuits that have included the state law determinations in their review have not been explicit as to their reasons for doing so, we believe they were, at least implicitly, exercising supplemental jurisdiction over these issues under 28 U.S.C. § 1367(a).[3]

---

[2](...continued)
[E]very time a carrier complains about a state agency's action concerning an agreement, it must start in federal court (to find out whether there has been a violation of federal law) and then may move to state court if the first suit yields the answer 'no'. This system may not have much to recommend it, but, . . . the 1996 Act has its share of glitches, and if this is another, the legislature can provide a repair.

Illinois Bell Tel. Co., 179 F.3d at 574.

[3] The supplemental jurisdiction statute provides:

[I]n any civil action of which the district courts have original jurisdiction,
(continued...)

In addition, having decided that the state commissions have the authority to interpret and enforce interconnection agreements and that the appropriate forum for review of these decisions is federal court, it would be a waste of judicial resources to limit the court's consideration to federal issues only. Therefore, we join the Fourth, Fifth and Ninth Circuits. We review de novo whether the Agreement as interpreted by the OCC complies with the requirements of the Act, and we review under an arbitrary or capricious standard the OCC's state law determinations. Compare Haymaker v. Oklahoma Corp. Comm'n, 731 P.2d 1008, 1010 (Okl. App. 1986) ("the Corporation Commission has wide discretion in the performance of its legal duties"). We now turn to the merits of this case.[4]

## II

We first consider whether the OCC properly interpreted the Agreement as requiring reciprocal compensation for calls to ISPs. The Agreement itself and state law

---

[3](...continued)
the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

[4] While we could remand this matter to the district court for a determination in the first instance as to whether the OCC's construction of the Interconnection Agreement complies with Oklahoma state contract law, we conclude such a remand is unnecessary because no fact-finding is required to resolve the state contract law issue. See Trierweiler v. Croxton and Trench Holding Corp., 90 F.3d 1523, 1539 (10th Cir. 1996).

principles govern the questions of interpretation of the contract and enforcement of its provisions. Southwestern Bell, 208 F.3d at 485. The OCC required reciprocal compensation for calls to ISPs not because federal law requires such compensation, but because the Agreement, as construed under Oklahoma state law, requires it.

Under Oklahoma law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." Okla. Stat. Ann. tit. 15, § 152 (2000). "When a contract is reduced to writing, the intention of the parties is to be interpreted from the writing alone, and if unambiguous, the language of the contract controls." Malicoate v. Standard Life and Accident Ins. Co., 999 P.2d 1103, 1112 (Okla. 2000). The OCC, however, has an obligation to interpret the Agreement within the bounds of existing federal law.

The FCC, in its order In The Matter of Access Charge Reform, 12 F.C.C.R. 15982, ¶ 348 (1997), decided that "ISPs should not be subjected to an interstate regulatory system designed for circuit-switched interexchanged voice telephony solely because ISPs use incumbent LEC networks to receive calls from their customers." The FCC refused to allow LECs to assess interstate per-minute access charges on ISPs, even for calls that appear to traverse state boundaries. Id. at ¶ 342-344. Finally, the FCC concluded that "ISPs should remain classified as end users for purposes of the access charge system." Id. at ¶ 348. Therefore, the OCC properly determined that the FCC had an established policy of treating ISPs as end-users and subsequently interpreted the Agreement within

12

the context of that policy.

The OCC determined that the telecommunication traffic in question was local traffic within the scope of the reciprocal compensation provision of the Agreement. The OCC concluded: "[w]here an interconnection agreement defined 'local traffic' as traffic which originates and terminates within a given local calling area, calls from an end-user to an ISP located in the same local calling area are subject to the reciprocal compensation rate." The OCC then applied this determination to the Agreement.

The Agreement defines "local traffic" as traffic which "originates and terminates within a [Southwestern Bell] exchange including mandatory local calling scope arrangements." "Terminating traffic" is defined as "voice grade switched telecommunications service which is delivered to an end-user(s) as a result of another end-user's attempt to establish communications between the parties." The OCC reasoned that because the FCC treats ISPs as end-users, the point of termination of calls to ISPs is the location of the ISP. Moreover, where the calling party and the called party, in this case the ISP, are located in the same local calling area, the call is "local traffic" under the express terms of the Agreement. See supra p.3. The OCC also concluded that calls to ISPs are "terminating traffic" as defined in the Agreement because "by placing a call to an ISP the end-user originating the call in effect 'establishes communications' with another end-user." We believe the OCC reasonably interpreted the Agreement to mean that calls to ISPs are "terminating traffic" subject to reciprocal compensation. Therefore,

13

we find that the OCC's interpretation of the Agreement was neither arbitrary nor capricious.

III

Finally, we consider whether the Agreement, as interpreted by the OCC, violates existing federal law, namely the Act and the FCC's regulations or rulings pursuant to the Act. Southwestern Bell argues the district court erred in determining the Agreement does not violate federal law. Specifically, Southwestern Bell argues the OCC's interpretation of the Act and the FCC decisions relied upon in reaching its decision were erroneous in light of the FCC's ISP Declaratory Ruling, In The Matter of Implementation of the Local Competition Provisions in the Telecomm. Act of 1996 Inter-Carrier Compensation for ISP-Bound Traffic, 14 F.C.C.R. 3689 (1999), vacated and remanded sub nom. Bell Atl. Tel. Co. v. F.C.C., 206 F.3d 1 (D.C. Cir. 2000) (ISP Ruling) .

In the ISP Ruling, the FCC attempted to clarify whether a local exchange carrier is entitled to receive reciprocal compensation for traffic delivered to an ISP. Both Southwestern Bell and Brooks Fiber rely heavily upon the ISP Ruling in their briefs. Southwestern Bell argues the FCC's determinations support its argument that calls to ISPs are not local calls and, therefore, not subject to reciprocal compensation. Brooks Fiber relies upon the ruling for the proposition that existing interconnection agreements, as interpreted by state commissions, are binding until the FCC issues a definitive rule on the subject. Id.

14

Although the ISP Ruling was vacated and remanded "for want of reasoned decision-making," Bell Atl., 206 F.3d at 9, we believe it provides valuable insight as to the FCC's view regarding this issue.[5] In the ISP Ruling, the FCC stated that it currently "has no rule governing inter-carrier compensation." ISP Ruling, 14 F.C.C.R. 3689 at ¶ 1. The FCC further stated: "We find no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic, pending adoption of a rule establishing an appropriate interstate compensation mechanism." Id. at ¶ 21. The FCC acknowledged that it had historically directed states to treat ISP traffic as local. Id. at ¶ 23. Therefore, the district court's conclusion that the Agreement does not violate federal law is correct even when analyzed in light of the ISP Ruling.

---

[5] In Bell Atl., the court reviewed the FCC's ruling that calls to ISPs within the caller's local calling area are non-local for purposes of reciprocal compensation. In reaching this conclusion, the FCC applied an "end-to-end" analysis which focuses on the end points of the communication. Bell Atl., 206 F.3d at 4. Based on this analysis, the FCC determined that calls to ISPs are non-local because the communication travels beyond the ISP to the various websites located around the world. Id. at 2. The court noted:

> The end-to-end analysis applied by the Commission here is one that it has traditionally used to determine whether a call is within its interstate jurisdiction. Here it used the analysis for quite a different purpose, without explaining why such an extension made sense in terms of the statute or the Commission's own regulations. Because of this gap, we vacate the ruling and remand the case. . .

Id. at 3.

The OCC analyzed the FCC's regulatory treatment of ISPs at the time the Agreement was signed and prior to the issuance of the ISP Ruling. The OCC looked to the specific language of the Act which imposes a duty "to establish reciprocal compensation for the transport and termination of 'telecommunications.'" The OCC explained that the FCC, in its Federal-State Joint Bd. on Universal Service, 12 F.C.C.R. 8776 (1997), confirmed that services provided by ISPs constitute "information services" and not "telecommunications" under the Act's definitions.[6] The OCC noted that the FCC also found that the connection between an end-user and an ISP is a "telecommunications

---

[6] The Act provides the following relevant definitions:

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.
47 U.S.C. § 153(43).

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.
Id. § 153(46).

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

Id. § 153(20).

16

service" and is distinguishable from the ISP's service offering. Finally, the OCC determined "the FCC has maintained a policy of requiring LECs to treat ISPs as end users - i.e., as local service business customers rather than as interexchange carriers." Based on this analysis, the OCC concluded that "as a matter of federal law, calls from end-users to ISPs constitute 'telecommunications' and are subject to reciprocal compensation."

The OCC concluded that "reciprocal compensation is due between the carriers pursuant to whatever compensation arrangement the parties have contractually established through their interconnection agreement." We agree with the district court that the OCC did not misapprehend federal law in reaching its decision. Accordingly, we affirm the district court's decision that the Agreement, as interpreted by the OCC, does not violate federal law.

For all the foregoing reasons, the judgment of the district court as modified is AFFIRMED.